6/8/2020 11:54:17 AM

# Compare Results

| Old File: | | New File: |
|---|---|---|
| **18-1334_new.pdf** | versus | **18-1334_new1.pdf** |
| **61 pages (348 KB)** | | **61 pages (345 KB)** |
| 6/5/2020 8:48:56 AM | | 6/8/2020 11:51:57 AM |

**Total Changes**

**3**

**Content**

3 Replacements

0 Insertions

0 Deletions

**Styling and Annotations**

0 Styling

0 Annotations

Go to First Change (page 41)

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO *v.* AURELIUS INVESTMENT, LLC, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 18–1334.　Argued October 15, 2019—Decided June 1, 2020*

In 2016, in response to a fiscal crisis in Puerto Rico, Congress invoked its Article IV power to "make all needful Rules and Regulations respecting the Territory . . . belonging to the United States," §3, cl. 2, to enact the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA). PROMESA created a Financial Oversight and Management Board, whose seven voting members are to be appointed by the President without the Senate's advice and consent. Congress authorized the Board to file for bankruptcy on behalf of Puerto Rico or its instrumentalities, to supervise and modify Puerto Rico's laws and budget, and to gather evidence and conduct investigations in support of these efforts.

After President Obama selected the Board's members, the Board filed bankruptcy petitions on behalf of the Commonwealth and five of its entities. Both court and Board had decided a number of matters when several creditors moved to dismiss the proceedings on the ground that the Board members' selection violated the Constitution's Appointments Clause, which says that the President "shall nominate, and by

---

*Together with No. 18–1475, *Aurelius Investment, LLC, et al.* v. *Commonwealth of Puerto Rico et al.*, No. 18–1496, *Official Committee of Unsecured Creditors of All Title III Debtors Other Than COFINA* v. *Aurelius Investment, LLC, et al.*, No. 18–1514, *United States* v. *Aurelius Investment, LLC, et al.*, and No. 18–1521, *Unión de Trabajadores de la Industria Eléctrica y Riego, Inc.* v. *Financial Oversight and Management Board for Puerto Rico et al.*, also on certiorari to the same court.

and with the Advice and Consent of the Senate, shall appoint . . . all . . . Officers of the United States . . . ." Art. II, §2, cl. 2. The court denied the motions, but the First Circuit reversed. It held that the Board members' selection violated the Appointments Clause but also concluded that any Board actions taken prior to its decision were valid under the "*de facto* officer" doctrine.

*Held*:

1. The Appointments Clause constrains the appointments power as to all officers of the United States, even those who exercise power in or in relation to Puerto Rico. The Constitution's structure provides strong reason to believe that this is so. The Appointments Clause reflects an allocation of responsibility, between President and Senate, in cases involving appointment to high federal office. Concerned about possible manipulation of appointments, the Founders both concentrated the appointment power and distributed it, ensuring that primary responsibility for important nominations would fall on the President while also ensuring that the Senate's advice and consent power would provide a check on that power. Other, similar structural constraints in the Constitution apply to all exercises of federal power, including those related to Article IV entities. Cf., *e.g.*, *Metropolitan Washington Airports Authority* v. *Citizens for Abatement of Aircraft Noise, Inc.*, 501 U. S. 252, 270–271 (*MWAA*). The objectives advanced by the Appointments Clause counsel strongly in favor of applying that Clause to all officers of the United States, even those with powers and duties related to Puerto Rico. Indeed, the Clause's text firmly indicates that it applies to the appointment of all "Officers of the United States." And history confirms this reading. Congress' longstanding practice of requiring the Senate's advice and consent for territorial Governors with important federal duties supports the inference that Congress expected the Appointments Clause to apply to at least some officials with supervisory authority over the Territories. Pp. 5–9.

2. The Appointments Clause does not restrict the appointment or selection of the Board members. Pp. 9–21.

(a) The Appointments Clause does not restrict the appointment of local officers that Congress vests with primarily local duties. The Clause's language suggests a distinction between federal officers—who exercise power of the National Government—and nonfederal officers— who exercise power of some other government. Pursuant to Article I, §8, cl. 17, and Article IV, §3, Congress has long legislated for entities that are not States—the District of Columbia and the Territories. In so doing, Congress has both made local law directly and also created local government structures, staffed by local officials, who themselves have made and enforced local law. This suggests that when Congress

creates local offices using these two unique powers, the officers exercise power of the local government, not the Federal Government. Historical practice indicates that a federal law's creation of an office does not automatically make its holder an officer of the United States. Congress has for more than two centuries created local offices for the Territories and District of Columbia that are filled through election or local executive appointment. And the history of Puerto Rico—whose public officials with important local responsibilities have been selected in ways that the Appointments Clause does not describe—is consistent with the history of other entities that fall within Article IV's scope and with the history of the District of Columbia. This historical practice indicates that when an officer of one of these local governments has primarily local duties, he is not an officer of the United States within the meaning of the Appointments Clause. Pp. 9–14.

(b) The Board members here have primarily local powers and duties. PROMESA says that the Board is "an entity within the territorial government" that "shall not be considered a department, agency, establishment, or instrumentality of the Federal Government," §101(c), 130 Stat. 553, and Congress gave the Board a structure, duties, and related powers that are consistent with this statement. The Board's broad investigatory powers—administering oaths, issuing subpoenas, taking evidence, and demanding data from governments and creditors alike—are backed by Puerto Rican, not federal, law. Its powers to oversee the development of Puerto Rico's fiscal and budgetary plans are also quintessentially local. And in exercising its power to initiate bankruptcy proceedings, the Board acts on behalf of, and in the interests of, Puerto Rico. Pp. 14–17.

(c) *Buckley* v. *Valeo*, 424 U. S. 1, *Freytag* v. *Commissioner*, 501 U. S. 868, and *Lucia* v. *SEC*, 585 U. S. ___, do not provide the relevant legal test here, for each considered an Appointments Clause problem concerning the importance or significance of duties that were indisputably *federal* or national in nature. Nor do *Lebron* v. *National Railroad Passenger Corporation*, 513 U. S. 374, or *MWAA*, 501 U. S. 252, help. *Lebron* considered whether Amtrak was a governmental or a private entity, but the fact that the Board is a Government entity does not answer the "primarily local versus primarily federal" question. And the *MWAA* Court expressly declined to address Appointments Clause questions. However, the Court's analysis in *O'Donoghue* v. *United States*, 289 U. S. 516, and *Palmore* v. *United States*, 411 U. S. 389, does provide a rough analogy. In *O'Donoghue*, the Court found that Article III's tenure and salary protections applied to judges of the District of Columbia courts because those courts exercised the judicial power of the United States. But the Court reached the seemingly opposite con-

clusion in *Palmore*, a case decided after Congress had altered the nature of the District of Columbia local courts so that its judges adjudicated primarily local issues. Pp. 17–21.

3. Given the conclusion reached here, there is no need to consider whether to overrule the "Insular Cases" and their progeny, see, *e.g.*, *Downes* v. *Bidwell*, 182 U. S. 244, 287, to consider the application of the *de facto* officer doctrine, see *Ryder* v. *United States*, 515 U. S. 177, or to decide questions about the application of the Federal Relations Act and Public Law 600. Pp. 21–22.

915 F. 3d 838, reversed and remanded.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and GINSBURG, ALITO, KAGAN, GORSUCH, and KAVANAUGH, JJ., joined. THOMAS, J., and SOTOMAYOR, J., filed opinions concurring in the judgment.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

Nos. 18–1334, 18–1475, 18–1496, 18–1514 and 18–1521

FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, PETITIONER
18–1334                *v.*
AURELIUS INVESTMENT, LLC, ET AL.

AURELIUS INVESTMENT, LLC, ET AL., PETITIONERS
18–1475                *v.*
COMMONWEALTH OF PUERTO RICO, ET AL.

OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALL TITLE III DEBTORS OTHER THAN COFINA, PETITIONER
18–1496                *v.*
AURELIUS INVESTMENT, LLC, ET AL.

UNITED STATES, PETITIONER
18–1514                *v.*
AURELIUS INVESTMENT, LLC, ET AL.

UNIÓN DE TRABAJADORES DE LA INDUSTRIA ELÉCTRICA Y RIEGO, INC., PETITIONER
18–1521                *v.*
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[June 1, 2020]

JUSTICE BREYER delivered the opinion of the Court.

The Constitution's Appointments Clause says that the President

> "shall nominate, *and by and with the Advice and Consent of the Senate*, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other *Officers of the United States . . . .*" Art. II, §2, cl. 2 (emphasis added).

In 2016, Congress enacted the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA). 130 Stat. 549, 48 U. S. C. §2101 *et seq.* That Act created a Financial Oversight and Management Board, and it provided, as relevant here, that the President could appoint its seven members without "the advice and consent of the Senate," *i.e.*, without Senate confirmation.

The question before us is whether this method of appointment violates the Constitution's Senate confirmation requirement. In our view, the Appointments Clause governs the appointments of all officers of the United States, including those located in Puerto Rico. Yet two provisions of the Constitution empower Congress to create local offices for the District of Columbia and for Puerto Rico and the Territories. See Art. I, §8, cl. 17; Art. IV, §3, cl. 2. And the Clause's term "Officers of the United States" has never been understood to cover those whose powers and duties are primarily local in nature and derive from these two constitutional provisions. The Board's statutory responsibilities consist of primarily local duties, namely, representing Puerto Rico in bankruptcy proceedings and supervising aspects of Puerto Rico's fiscal and budgetary policies. We therefore find that the Board members are not "Officers of

the United States." For that reason, the Appointments Clause does not dictate how the Board's members must be selected.

## I

### A

In 2006, tax advantages that had previously led major businesses to invest in Puerto Rico expired. See Small Business Job Protection Act of 1996, §1601, 110 Stat. 1827. Many industries left the island. Emigration increased. And the public debt of Puerto Rico's government and its instrumentalities soared, rising from $39.2 billion in 2005 to $71 billion in 2016. See Dept. of Treasury, Puerto Rico's Economic and Fiscal Crisis 1, 3, https://www.treasury.gov/ connect/blog/Documents/Puerto_Ricos_fiscal_challenges.pdf; GAO, U. S. Territories: Public Debt Outlook 12 (GAO–18– 160, 2017).

Puerto Rico found that it could not service that debt. Yet Puerto Rico could not easily restructure it. The Federal Bankruptcy Code's municipality-related Chapter 9 did not apply to Puerto Rico (or to the District of Columbia). See 11 U. S. C. §§109(c), 101(52). But at the same time, federal bankruptcy law invalidated Puerto Rico's own local "debt-restructuring" statutes. *Puerto Rico* v. *Franklin Cal. Tax-Free Trust*, 579 U. S. ___ (2016). In 2016, in response to Puerto Rico's fiscal crisis, Congress enacted PROMESA. 130 Stat. 549, 48 U. S. C. §2101 *et seq.*

PROMESA allows Puerto Rico and its entities to file for federal bankruptcy protection. See §§301, 302, 130 Stat. 577, 579; cf. 11 U. S. C. §901 (related to bankruptcies of local governments). The filing and subsequent proceedings are to take place in the United States District Court for the District of Puerto Rico, before a federal judge selected by the Chief Justice of the United States. PROMESA §§307– 308, 130 Stat. 582. PROMESA also created the Financial Oversight and Management Board—with seven members

appointed by the President and with the Governor serving
as an ex officio member.  §§101(b), (e), *id.*, at 553, 554–555.
PROMESA gives the Board authority to file for bankruptcy
on behalf of Puerto Rico or its instrumentalities.  §304(a),
*id.*, at 579.  The Board can supervise and modify Puerto
Rico's laws (and budget) to "achieve fiscal responsibility and
access to the capital markets."  §201(b), *id.*, at 564; see
§§201–207, *id.*, at 563–575.  And it can gather evidence and
conduct investigations in support of these efforts.  §104, *id.*,
at 558–561.

As we have just said, PROMESA gives the President of
the United States the power to appoint the Board's seven
members without Senate confirmation, so long as he selects
six from lists prepared by congressional leaders.
§101(e)(2)(A), *id.*, at 554–555.

B

On August 31, 2016, President Obama selected the
Board's seven members in the manner just described.  The
Board established offices in Puerto Rico and New York, and
soon filed bankruptcy petitions on behalf of the Common-
wealth and (eventually) five Commonwealth entities.  Title
III Petition in No. 17–BK–3283 (PR); see Order Pursuant
to PROMESA Section 304(g), No. 17–BK–3283 (PR, Oct. 9,
2019), Doc. 8829 (consolidating petitions filed on behalf of
the Commonwealth of Puerto Rico, the Puerto Rico Sales
Tax Financing Corporation, the Puerto Rico Highways and
Transportation Authority, the Employees Retirement Sys-
tem of the Government of the Commonwealth of Puerto
Rico, the Puerto Rico Electric Power Authority, and the
Puerto Rico Public Buildings Authority).  And the Chief
Justice then selected a federal judge to serve as bankruptcy
judge for Puerto Rico.  Designation of Presiding District
Judge, No. 17–BK–3283 (PR, May 5, 2017), Doc. 4.

After both court and Board had decided a number of mat-
ters, several creditors moved to dismiss all proceedings on

the ground that the Board members' selection violated the Appointments Clause. The court denied the motions. See *In re Financial Oversight and Management Bd. of Puerto Rico*, 318 F. Supp. 3d 537, 556–557 (PR 2018). The creditors appealed to the United States Court of Appeals for the First Circuit. That court reversed. It held that the selection of the Board's members violated the Appointments Clause. 915 F. 3d 838, 861 (2019). But it concluded that those Board actions taken prior to its decision remained valid under the "*de facto* officer" doctrine. *Id.*, at 862–863; see, *e.g.*, *McDowell* v. *United States*, 159 U. S. 596, 601 (1895) (judicial decisions could not later be attacked on ground that an unlawfully sitting judge presided); *Ball* v. *United States*, 140 U. S. 118, 128–129 (1891) (same).

The Board, the United States, and various creditors then filed petitions for certiorari in this Court, some arguing that the appointments were constitutionally valid, others that the *de facto* officer doctrine did not apply. Compare Pets. for Cert. in Nos. 18–1334, 18–1496, 18–1514 with Pets. for Cert. in Nos. 18–1475, 18–1521. In light of the importance of the questions, we granted certiorari in all the petitions and consolidated them for argument. 588 U. S. ___ (2019).

## II

Congress created the Board pursuant to its power under Article IV of the Constitution to "make all needful Rules and Regulations respecting the Territory . . . belonging to the United States." §3, cl. 2; see PROMESA §101(b)(2), 130 Stat. 553. Some have argued in these cases that the Appointments Clause simply does not apply in the context of Puerto Rico. But, like the Court of Appeals, we believe the Appointments Clause restricts the appointment of all officers of the United States, including those who carry out their powers and duties in or in relation to Puerto Rico.

The Constitution's structure provides strong reason to believe that is so. The Constitution separates the three basic

powers of Government—legislative, executive, and judicial—with each branch serving different functions. But the Constitution requires cooperation among the three branches in specified areas. Thus, to become law, proposed legislation requires the agreement of both Congress and the President (or, a supermajority in Congress). See *INS* v. *Chadha*, 462 U. S. 919, 955 (1983) (noting that the Constitution prescribes only four specific actions that Congress can take without bicameralism and presentment). At the same time, legislation must be consistent with constitutional constraints, and we usually look to the Judiciary as the ultimate interpreter of those constraints.

The Appointments Clause reflects a similar allocation of responsibility, between President and Senate, in cases involving appointment to high federal office. That Clause reflects the Founders' reaction to "one of [their] generation's greatest grievances against [pre-Revolutionary] executive power," the manipulation of appointments. *Freytag* v. *Commissioner*, 501 U. S. 868, 883 (1991); see also The Federalist No. 76, p. 455 (C. Rossiter ed. 1961) (A. Hamilton) (the Appointments Clause helps to preserve democratic accountability). The Founders addressed their concerns with the appointment power by both concentrating it and distributing it. On the one hand, they ensured that primary responsibility for nominations would fall on the President, whom they deemed "less vulnerable to interest-group pressure and personal favoritism" than a collective body. *Edmond* v. *United States*, 520 U. S. 651, 659 (1997). See also The Federalist No. 76, at 455 ("The sole and undivided responsibility of one man will naturally beget a livelier sense of duty and a more exact regard to reputation"). On the other hand, they ensured that the Senate's advice and consent power would provide "an excellent check upon a spirit of favoritism in the President and a guard against the appointment of unfit characters." *NLRB* v. *SW General, Inc.*, 580 U. S. ___, ___ (2017) (slip op., at 2) (internal quotation marks

omitted). By "limiting the appointment power" in this fashion, the Clause helps to "ensure that those who wielded [the appointments power] were accountable to political force and the will of the people." *Freytag*, *supra*, at 884; see also *Edmond*, 520 U. S., at 659. "The blame of a bad nomination would fall upon the president singly and absolutely," while "[t]he censure of rejecting a good one would lie entirely at the door of the senate." *Id.*, at 660 (internal quotation marks omitted).

These other structural constraints, designed in part to ensure political accountability, apply to all exercises of federal power, including those related to Article IV entities. Cf., *e.g.*, *Metropolitan Washington Airports Authority* v. *Citizens for Abatement of Aircraft Noise, Inc.*, 501 U. S. 252, 270–271 (1991) (*MWAA*) (separation-of-powers principles apply when Congress acts under its Article IV power to legislate "respecting . . . other Property"). See also, *e.g.*, Act of Aug. 7, 1789, ch. 8, 1 Stat. 50 (the First Congress using bicameralism and presentment to make rules and regulations for the Northwest Territory). The objectives advanced by the Appointments Clause counsel strongly in favor of that Clause applying to the appointment of all "Officers of the United States." Why should it be different when such an officer's duties relate to Puerto Rico or other Article IV entities?

Indeed, the Appointments Clause has no Article IV exception. The Clause says in part that the President

> "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments . . . shall be established by Law . . . ." Art. II, §2, cl. 2.

That text firmly indicates that it applies to the appointment of *all* "Officers of the United States." And history confirms

this reading. Before the writing of the Constitution, Congress had enacted an ordinance that allowed Congress to appoint officers to govern the Northwest Territory. As soon as the Constitution became law, the First Congress "adapt[ed]" that ordinance "to the present Constitution of the United States," Act of Aug. 7, 1789, 1 Stat. 51, in large part by providing for an appointment process consistent with the constraints of the Appointments Clause. In particular, it provided for a Presidential-appointment, Senate-confirmation process for high-level territorial appointees who assumed federal, as well as local, duties. See *id.,* at 52, n. (*a*); §1, *id.*, at 53 (appointment by President, and confirmation by Senate, of Governor, secretary, and members of the upper house); Act of Sept. 11, 1789, ch. 13, §1, 1 Stat. 68 (Governor "discharg[ed]" the federal "duties of superintendent of Indian affairs"). Later Congresses took a similar approach to later territorial Governors with federal duties. See Act of June 6, 1900, §10, 31 Stat. 325 (appointment of Governor of Territory of Alaska by President with confirmation by Senate); §2, *id.*, at 322 (federal duties of Alaska territorial Governor include entering into contracts in name of the United States and granting reprieves for federal offenses); Act of Mar. 2, 1819, §§3, 10, 3 Stat. 494, 495 (similar for Governor of Arkansas). We do not mean to suggest that every time Congress chooses to require advice and consent procedures it does so because they are constitutionally required. At times, Congress may wish to require Senate confirmation for policy reasons. Even so, Congress' practice of requiring advice and consent for these Governors with important federal duties supports the inference that Congress expected the Appointments Clause to apply to at least some officials with supervisory authority over the Territories.

Given the Constitution's structure, this history, roughly analogous case law, and the absence of any conflicting authority, we conclude that the Appointments Clause constrains the appointments power as to all "Officers of the

United States," even when those officers exercise power in or related to Puerto Rico.

## III
### A

The more difficult question before us is whether the Board members are officers of the United States such that the Appointments Clause requires Senate confirmation. If they are not officers of the United States, but instead are some other type of officer, the Appointments Clause says nothing about them. (No one suggests that they are "Ambassadors," "other public Ministers and Consuls," or "Judges of the supreme Court.") And as we shall see, the answer to this question turns on whether the Board members have primarily local powers and duties.

The language at issue does not offer us much guidance for understanding the key term "of the United States." The text suggests a distinction between federal officers—officers exercising power of the National Government—and nonfederal officers—officers exercising power of some other government. The Constitution envisions a federalist structure, with the National Government exercising limited federal power and other, local governments—usually state governments—exercising more expansive power. But the Constitution recognizes that for certain localities, there will be no state government capable of exercising local power. Thus, two provisions of the Constitution, Article I, §8, cl. 17, and Article IV, §3, cl. 2, give Congress the power to legislate for those localities in ways "that would exceed its powers, or at least would be very unusual" in other contexts. *Palmore* v. *United States*, 411 U. S. 389, 398 (1973). Using these powers, Congress has long legislated for entities that are not States—the District of Columbia and the Territories. See *District of Columbia* v. *John R. Thompson Co.*, 346 U. S. 100, 104–106 (1953). And, in doing so, Congress has both made local law directly and also created structures

of local government, staffed by local officials, who them-
selves have made and enforced local law.  Compare, *e.g.*, Act
of Mar. 2, 1962, §401, 76 Stat. 17 (changing D. C. liquor tax
from $1.25 per gallon to $1.50 per gallon), with District of
Columbia Self-Government and Governmental Reorganiza-
tion Act, 87 Stat. 774 (giving local D. C. government pri-
mary legislative control over local matters).  This structure
suggests that when Congress creates local offices using
these two unique powers, the officers exercise power of the
local government, not the Federal Government.  Cf. *Ameri-
can Ins. Co.* v. *356 Bales of Cotton*, 1 Pet. 511, 546 (1828)
(Marshall, C. J.) (territorial courts may exercise the judicial
power of the Territories without the life tenure and salary
protections mandated by Article III for federal judges); *Cin-
cinnati Soap Co.* v. *United States*, 301 U. S. 308, 323 (1937)
(territorial legislators may exercise the legislative power of
the Territories without violating the nondelegation doc-
trine).

History confirms what the Constitution's text and struc-
ture suggest.  See *NLRB* v. *Noel Canning*, 573 U. S. 513,
524 (2014) (relying on history and structure in interpreting
the Recess Appointments Clause).  See also *McCulloch* v.
*Maryland*, 4 Wheat. 316, 401 (1819) (emphasizing the util-
ity of historical practice in interpreting constitutional pro-
visions).  Longstanding practice indicates that a federal
law's creation of an office in this context does not automat-
ically make its holder an "Officer of the United States."  Ra-
ther, Congress has often used these two provisions to create
local offices filled in ways other than those specified in the
Appointments Clause.  When the First Congress legislated
for the Northwest Territories, for example, it created a
House of Representatives for the Territory with members
selected by election.  It also created an upper house of the
territorial legislature, whose members were appointed by
the President (without Senate confirmation) from lists pro-

vided by the elected, lower house. And it created magistrates appointed by the Governor. See Act of Aug. 7, 1789, 1 Stat. 51, n. (*a*).

The practice of creating by federal law local offices for the Territories and District of Columbia that are filled through election or local executive appointment has continued unabated for more than two centuries. See, *e.g.*, *ibid.* (Northwest Territories local offices filled by election); Act of Apr. 7, 1798, §3, 1 Stat. 550 (Mississippi, same); Act of May 7, 1800, §2, 2 Stat. 59 (Indiana, same); Act of May 15, 1820, §3, 3 Stat. 584 (District of Columbia, same); Act of Apr. 30, 1900, §13, 31 Stat. 144 (Hawaii, same); Act of Aug. 24, 1912, §4, 37 Stat. 513 (Alaska, same); Act of Aug. 23, 1968, §4, 82 Stat. 837 (Virgin Islands, same); Act of Sept. 11, 1968, Pub. L. 90–497, §1, 82 Stat. 842 (Guam, same); Act of May 4, 1812, §3, 2 Stat. 723 (D. C. mayor appoints "all offices"); Act of June 4, 1812, §2, 2 Stat. 744 (Missouri Governor, similar); Act of Mar. 2, 1819, §3, 3 Stat. 494 (Arkansas, similar); Act of June 6, 1900, §2, 31 Stat. 322 (Alaska, similar); Act of Sept. 11, 1968, §1, 82 Stat. 843 (Guam, similar). Like JUSTICE THOMAS, *post,* at 6 (opinion concurring in judgment), we think the practice of the First Congress is strong evidence of the original meaning of the Constitution. We find this subsequent history similarly illuminates the text's meaning.

Puerto Rico's history is no different. It reveals a longstanding practice of selecting public officials with important local responsibilities in ways that the Appointments Clause does not describe. In 1898, at the end of the Spanish-American War, the United States took responsibility for determining the civil rights of Puerto Ricans as well as Puerto Rico's political status. Treaty of Paris, Art. 9, Dec. 10, 1898, 30 Stat. 1759. In 1900, the Foraker Act provided for Presidential appointment (with Senate confirmation) of Puerto Rico's Governor, the heads of six departments, the legislature's upper house, and the justices of its

high court.  Organic Act of 1900, §§ 17, 18, 33, 31 Stat. 81,
84.  But it also provided for the selection, through popular
election, of a lower legislative house with the power (subject
to upper house concurrence) to "alter, amend, modify, and
repeal any and all laws . . . of every character."  §§27, 32,
*id.*, at 82, 84.  There is no indication that anyone thought
members of the lower house, wielding important local re-
sponsibilities, were "Officers of the United States."

Congress replaced the Foraker Act with the Jones Act in
1917.  Organic Act of Puerto Rico, ch. 145, 39 Stat. 951.  Un-
der the Jones Act the Puerto Rican Senate was elected and
consequently no longer satisfied the Appointments Clause
criteria.  See §26, *id.*, at 958.  Similarly, the Governor of
Puerto Rico nominated four cabinet members, confirmed by
the Senate of Puerto Rico. §13, *id.*, at 955–956.  The elected
legislature retained "all local legislative powers," including
the power to appropriate funds.  §§ 25, 34, 37, *id.*, at 958,
962, 964.

Congress amended the Jones Act in 1947 to provide for
an elected Governor of Puerto Rico, and granted that Gov-
ernor the power to appoint all cabinet officials.  See Act of
Aug. 5, 1947, ch. 490, §§ 1, 3, 61 Stat. 770, 771.  The Presi-
dent retained the power to appoint (with Federal Senate
confirmation) judges, an auditor, and the new office of Co-
ordinator of Federal Agencies, who was to supervise federal
functions in Puerto Rico and recommend to higher federal
officials ways to improve the quality of federal services. §6,
*id.*, at 772.

In 1950, Congress enacted Public Law 600, "in the nature
of a compact" with Puerto Rico and subject to approval by
the voters of Puerto Rico.  Act of July 3, 1950, ch. 446, §§1,
2, 64 Stat. 319.  The Act adopted the Jones Act, as amended,
as the Puerto Rican Federal Relations Act, and provided for
the Jones Act's substantial (but not complete) repeal upon
the effective adoption of a contemplated Puerto Rican con-
stitution.  §§4, 5, *id.*, at 319–320.  Among the provisions of

the Jones Act that Public Law 600 retained were several related to Puerto Rico's public debt. Congress retained, for example, the triple-tax-exempt nature of Puerto Rican bonds. Jones Act, §3, 39 Stat. 953. It also retained a (later repealed) cap on the amount of public debt Puerto Rico or its subdivisions could accumulate. *Ibid.* In a public referendum, the citizens of Puerto Rico approved Public Law 600—including the limits on debt in §3 of the Federal Relations Act—and then began the constitution-making process. Pub. L. 600, §§2, 3, 64 Stat. 319; see Act of July 3, 1952, 66 Stat. 327; A. Fernós-Isern, Original Intent in the Constitution of Puerto Rico 13 (2d ed. 2002).

Puerto Rico's popularly ratified Constitution, which Congress accepted with a few fairly minor changes, does not involve the President or the Senate in the appointment process for local officials. That Constitution provides for the election of Puerto Rico's Governor and legislators. Art. III, §1; Art. IV, §1. And it provides for gubernatorial appointment (and Puerto Rican Senate confirmation) of cabinet officers. Art. IV, §5.

The upshot is that Puerto Rico's history reflects longstanding use of various methods for selecting officials with primarily local responsibilities. This history is consistent with the history of other entities that fall within the scope of Article IV and with the history of the District of Columbia. See *supra*, at 10–11. And it comports with our precedents, which have long acknowledged that Congress may structure local governments under Article IV and Article I in ways that do not precisely mirror the constitutional blueprint for the National Government. See, *e.g., Benner* v. *Porter*, 9 How. 235, 242 (1850). Cf. *Glidden Co.* v. *Zdanok*, 370 U. S. 530, 546 (1962) (plurality opinion) (recognizing that local governments created by Congress could, like governments of the States, "dispense with protections deemed inherent in a separation of governmental powers"). Sometimes Congress has specified the use of methods that would

satisfy the Appointments Clause, other times it has speci-
fied methods that would not satisfy the Appointments
Clause, including elections and appointment by local offi-
cials. Officials with primarily local duties have often fallen
into the latter categories. We know of no case endorsing an
Appointments Clause based challenge to such selection
methods. Indeed, to read Appointments Clause constraints
as binding Puerto Rican officials with primarily local duties
would work havoc with Puerto Rico's (federally ratified)
democratic methods for selecting many of its officials.

We thus conclude that while the Appointments Clause
*does* restrict the appointment of "Officers of the United
States" with duties in or related to the District of Columbia
or an Article IV entity, it *does not* restrict the appointment
of local officers that Congress vests with primarily local du-
ties under Article IV, §3, or Article I, §8, cl. 17.

B

The question remains whether the Board members have
primarily local powers and duties. We note that the Clause
qualifies the phrase "Officers of the United States" with the
words "whose Appointments . . . shall be established by
Law." And we also note that PROMESA says that the
Board is "an entity within the territorial government" and
"shall not be considered a department, agency, establish-
ment, or instrumentality of the Federal Government."
§101(c), 130 Stat. 553. But the most these words show is
that Congress did not intend to make the Board members
"Officers of the United States." It does not prove that, inso-
far as the Constitution is concerned, they succeeded.

But we think they have. Congress did not simply state
that the Board is part of the local Puerto Rican government.
Rather, Congress also gave the Board a structure, a set of
duties, and related powers all of which are consistent with
this statement.

The government of Puerto Rico pays the Board's expenses, including the salaries of its employees (the members serve without pay). §107, *id.*, at 562; see §101(g), *id.*, at 556. The Board possesses investigatory powers. It can hold hearings. §104(a), *id.*, at 558. It can issue subpoenas, subject to Puerto Rico's limits on personal jurisdiction and enforceable under Puerto Rico's laws. §104(f), *id.*, at 559. And it can enforce those subpoenas in (and only in) Puerto Rico's courts. §§104(f)(2), 106(a), *id.*, at 559, 562.

From its own offices in or outside of Puerto Rico, the Board works with the elected government of Puerto Rico to develop a fiscal plan that provides "a method to achieve fiscal responsibility and access to the capital markets." §201(b), *id.*, at 564. If it finds it necessary, the Board can develop its own budget for Puerto Rico which is "deemed . . . approved" and becomes the operative budget. §202(e)(3), *id.*, at 568. It can ensure compliance with the plan and budget by reviewing the Puerto Rico government's laws and spending and by "direct[ing]" corrections or taking "such [other] actions as it considers necessary," including preventing a law from taking effect. §§203(d), 204(a), *id.*, at 569, 571. The Board controls the issuance of new debt for Puerto Rico. §207, *id.*, at 575.

The Board also may initiate bankruptcy proceedings for Puerto Rico or its instrumentalities. §304(a), *id.*, at 579. It may take any related "action necessary on behalf of," and it serves as "the representative of," Puerto Rico or its instrumentalities. §315, *id.*, at 584. These proceedings take place in the U. S. District Court for Puerto Rico. §307, *id.*, at 582.

To repeat: The Board has broad investigatory powers: It can administer oaths, issue subpoenas, take evidence and demand data from governments and creditors alike. But these powers are backed by Puerto Rican, not federal, law: Subpoenas are governed by Puerto Rico's personal jurisdiction statute; false testimony is punishable under the law of

Puerto Rico; the Board must seek enforcement of its sub-
poenas by filing in the courts of Puerto Rico.  See §104, *id.*,
at 558–561.  These powers are primarily local in nature.

The Board also oversees the development of Puerto Rico's
fiscal and budgetary plans.  It receives and evaluates pro-
posals from the elected Governor and legislature.  It can
create a budget "deemed" to be that of Puerto Rico.  It can
intervene when budgetary constraints are violated.  And it
has authority over the issuance of new debt.  §§201–207,
*id.*, at 563–575.  These powers, too, are quintessentially lo-
cal.  Each concerns the finances of the Commonwealth, not
of the United States.  The Board members in this respect
discharge duties ordinarily held by local officials.

Last, the Board has the power to initiate bankruptcy pro-
ceedings.  But in doing so, it acts not on behalf of the United
States, but on behalf of, and in the interests of, Puerto Rico.
The proceedings take place in federal court; but the same is
true of all persons or entities who seek bankruptcy protec-
tion.  The Board here acts as a local government that might
take precisely the same actions.  See, *e.g.*, 11 U. S. C.
§§109(c), 921 (related to bankruptcies of local govern-
ments).

Some Board actions, of course, may have nationwide con-
sequences.  But the same can be said of many actions taken
by many Governors or other local officials.  Taking actions
with nationwide consequences does not automatically
transform a local official into an "Officer of the United
States."  The challengers rely most heavily on the nation-
wide effects of the bankruptcy proceedings.  *E.g.*, Brief for
Aurelius et al. 31; Brief for Petitioner Unión de Trabaja-
dores de la Industria Eléctrica y Riego, Inc. (UTIER) 49.
But the same might be said of any major municipal, or even
corporate, bankruptcy.  *E.g.*, *In re Detroit*, 504 B. R. 97
(Bkrtcy. Ct. ED Mich. 2013) (restructuring $18 billion in
municipal debt).

In short, the Board possesses considerable power—including the authority to substitute its own judgment for the considered judgment of the Governor and other elected officials. But this power primarily concerns local matters. Congress' law thus substitutes a different process for determining certain local policies (related to local fiscal responsibility) in respect to local matters. And that is the critical point for current purposes. The local nature of the legislation's expressed purposes, the representation of local interests in bankruptcy proceedings, the focus of the Board's powers upon local expenditures, the local logistical support, the reliance on local laws in aid of the Board's procedural powers—all these features when taken together and judged in the light of Puerto Rico's history (and that of the Territories and the District of Columbia)—make clear that the Board's members have primarily local duties, such that their selection is not subject to the constraints of the Appointments Clause.

## IV

The Court of Appeals, pointing to three of this Court's cases, reached the opposite conclusion. See *Buckley* v. *Valeo*, 424 U. S. 1 (1976) (*per curiam*), *Freytag* v. *Commissioner*, 501 U. S. 868, and *Lucia* v. *SEC*, 585 U. S. \_\_\_ (2018). It pointed out that the Court, in those cases, discussed the term "Officer of the United States," and it concluded that, for Appointments Clause purposes, an appointee is such an "officer" if "(1) the appointee occupies a 'continuing' position established by federal law; (2) the appointee 'exercis[es] significant authority'; and (3) the significant authority is exercised 'pursuant to the laws of the United States.'" 915 F. 3d, at 856. The Court of Appeals concluded that the Board members satisfied this test. See *id.*, at 856–857.

We do not believe these three cases set forth the critical legal test relevant here, however, and we do not apply any

test they might enunciate. Each of the cases considered an Appointments Clause problem concerning the importance or significance of duties that were indisputably *federal* or national in nature. In *Buckley*, the question was whether members of the Federal Election Commission—appointees carrying out federal-election related duties—were "officers" for Appointments Clause purposes. In *Freytag*, the Court asked the same question about special federal trial judges serving on federal tax courts. And in *Lucia* the Court asked the same question about federal administrative law judges carrying out Securities and Exchange Commission duties.

Here, PROMESA, a federal law, creates the Board and its duties, and no one doubts their significance. But we cannot stop there. To do so would ignore the history we have discussed—history stretching back to the founding. See *supra*, at 10–13. And failing to take account of the nature of an appointee's federally created duties, *i.e.*, whether they are *primarily local versus primarily federal*, would threaten interference with democratic (or local appointment) selection methods in numerous Article IV Territories and perhaps the District of Columbia as well. See, *e.g.*, 48 U. S. C. §1422 (providing for an elected Governor of Guam); §1591 (same for Virgin Islands); District of Columbia Self-Government Act, §421, 87 Stat. 789 (same for D. C. Mayor); §422(2), 87 Stat. 790 (describing D. C. Mayor's appointment powers); 48 U. S. C. §1422c (same for Guam's Governor); §1597(c) (same for Virgin Islands). There is no reason to understand the Appointments Clause—which, at least in part, seeks to advance democratic accountability and broaden appointments-related responsibility, see *supra*, at 6–7—as making it significantly more difficult for local residents of such areas to share responsibility for the implementation of (statutorily created) primarily local duties. Neither the text nor the history of the Clause commands such a result.

Neither do *Lebron* v. *National Railroad Passenger Corporation*, 513 U. S. 374 (1995), or *MWAA*, 501 U. S. 252, help

those challenging the Board's constitutional legitimacy. *Lebron* considered whether, for First Amendment purposes, Amtrak was a governmental or a private entity. 513 U. S., at 379. All here agree that the Board is a Government entity, but that fact does not answer the "primarily local versus primarily federal" question. In *MWAA*, the Court held that separation-of-powers principles forbid Members of Congress to become members of a board that controls federally owned airports. 501 U. S., at 275–276 (relying on *Bowsher* v. *Synar*, 478 U. S. 714, 726 (1986), and *INS* v. *Chadha*, 462 U. S. 919, 952 (1983)). The Court expressly declined to answer any question related to the Appointments Clause. 501 U. S., at 277, n. 23.

While we have found no case from this Court directly on point, we believe that the Court's analysis in *O'Donoghue* v. *United States*, 289 U. S. 516 (1933), and especially *Palmore* v. *United States*, 411 U. S. 389, provides a rough analogy. In *O'Donoghue*, the Court considered whether Article III's tenure and salary protections applied to judges of the courts in the District of Columbia. The Court held that they did. Those courts, it believed, were "'courts of the United States'" and "recipients of the judicial power of the United States." 289 U. S., at 546, 548. The judges' salaries consequently could not be reduced. *Id.*, at 551.

In *Palmore*, however, the Court reached what might seem the precisely opposite conclusion. A criminal defendant, invoking *O'Donoghue*, argued that the D. C. Superior Court Judge could not constitutionally preside over the case because the judge lacked Article III's tenure protection, namely, life tenure. *Palmore, supra*, at 390. But the Court rejected the defendant's argument. Why? How did it explain *O'Donoghue*?

The difference, said the Court, lies in the fact that, in the meantime, Congress had changed the nature of the District of Columbia court. *Palmore, supra*, at 406–407; see District of Columbia Court Reform and Criminal Procedure Act of

1970, 84 Stat. 473.  Congress changed what had been a unified court system where judges adjudicated both local and federal issues into separate court systems, in one of which judges adjudicated primarily local issues.  §111, *id.*, at 475.  Courts in that category had criminal jurisdiction over only those cases brought "'under any law applicable exclusively to the District of Columbia.'"  *Id.*, at 486.  Its judges served for 15-year terms.  *Id.*, at 491.

This Court, in *Palmore*, considered a local judge presiding over a local court.  Congress had created that court in the exercise of its Article I power to "exercise exclusive Legislation in all Cases whatsoever" over the District of Columbia.  See Art I, §8, cl. 17.  The "focus" of these courts was "primarily upon . . . matters of strictly local concern."  411 U. S., at 407.  Hence, the nature of those courts was a "far cry" from that of the courts at issue in *O'Donoghue*.  *Palmore,* 411 U. S., at 406.

The Court added that Congress had created non-Article III courts under its Article IV powers.  It wrote that Congress could also create non-Article III courts under its Article I powers.  *Id.*, at 403, 410.  And it held that judges serving on those non-Article III courts lacked Article III protections.  *Id.*, at 410.

*Palmore* concerned Article I of the Constitution, not Article IV.  And it concerned "the judicial Power of the United States," not "Officers of the United States."  But it provides a rough analogy.  It holds that Article III protections do not apply to an Article I court "focus[ed]," unlike the courts at issue in *O'Donoghue*, primarily on local matters.  Here, Congress expressly invoked a constitutional provision allowing it to make local debt-related law (Article IV); it expressly located the Board within the local government of Puerto Rico; it clearly indicated that it intended the Board's members to be local officials; and it gave them primarily local powers, duties, and responsibilities.

In his concurring opinion, JUSTICE THOMAS criticizes the

inquiry we set out—whether an officer's duties are primarily local or primarily federal—as too "amorphous," *post*, at 10. But we think this is the test established by the Constitution's text, as illuminated by historical practice. And we cannot see how Congress could avoid the strictures of the Appointments Clause by adding to a federal officer's other obligations a large number of local duties. Indeed, we think that our test, tied as it is to both the text and the history of the Appointments Clause, is more rigorous than the bare inquiry into the "nature" of the officer's authority that JUSTICE THOMAS proposes, and we believe it is more faithful to the Clause's original meaning. *Ibid.*

## V

We conclude, for the reasons stated, that the Constitution's Appointments Clause applies to the appointment of officers of the United States with powers and duties in and in relation to Puerto Rico, but that the congressionally mandated process for selecting members of the Financial Oversight and Management Board for Puerto Rico does not violate that Clause. Given this conclusion, we need not consider the request by some of the parties that we overrule the much-criticized "Insular Cases" and their progeny. See, *e.g.*, *Downes* v. *Bidwell*, 182 U. S. 244, 287 (1901) (opinion of Brown, J.); *Balzac* v. *Porto Rico*, 258 U. S. 298, 309 (1922); *Reid* v. *Covert*, 354 U. S. 1, 14 (1957) (plurality opinion) (indicating that the Insular Cases should not be further extended); see also Brief for Official Committee of Unsecured Creditors of All Title III Debtors (Other than COFINA) 20–25 (arguing that the Insular Cases support reversal on the Appointments Clause issue); Brief for UTIER 64–66 (encouraging us to overrule the Insular Cases); Brief for Virgin Islands Bar Association as *Amicus Curiae* 13–18 (same); Cabranes, Citizenship and the American Empire, 127 U. Pa. L. Rev. 391, 436–442 (1978) (criticizing the Insular Cases); Littlefield, The Insular Cases, 15

Harv. L. Rev. 169 (1901) (same). Those cases did not reach
this issue, and whatever their continued validity we will not
extend them in these cases. See *Reid*, *supra,* at 14.

Neither, since we hold the appointment method valid,
need we consider the application of the *de facto* officer doc-
trine. See *Ryder* v. *United States*, 515 U. S. 177 (1995) (dis-
cussing the doctrine); see also, *e.g.*, Brief for Aurelius et al.
48–69 (arguing the doctrine does not apply in this context);
Brief for UTIER 69–85 (same); Reply Brief for United
States 26–47 (insisting to the contrary); Brief for Cross-Re-
spondent COFINA Senior Bondholders' Coalition 14–46
(same).

Finally, as JUSTICE SOTOMAYOR recognizes, *post*, at 8
(opinion concurring in judgment), we need not, and there-
fore do not, decide questions concerning the application of
the Federal Relations Act and Public Law 600. No party
has argued that those Acts bear any significant relation to
the answer to the Appointments Clause question now be-
fore us.

For these reasons, we reverse the judgment of the Court
of Appeals and remand the cases for further proceedings
consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 18–1334, 18–1475, 18–1496, 18–1514 and 18–1521

_____

FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, PETITIONER
18–1334                 _v._
AURELIUS INVESTMENT, LLC, ET AL.


AURELIUS INVESTMENT, LLC, ET AL., PETITIONERS
18–1475                 _v._
COMMONWEALTH OF PUERTO RICO, ET AL.


OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OF ALL TITLE III DEBTORS OTHER
THAN COFINA, PETITIONER
18–1496                 _v._
AURELIUS INVESTMENT, LLC, ET AL.


UNITED STATES, PETITIONER
18–1514                 _v._
AURELIUS INVESTMENT, LLC, ET AL.


UNIÓN DE TRABAJADORES DE LA INDUSTRIA
ELÉCTRICA Y RIEGO, INC., PETITIONER
18–1521                 _v._
FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[June 1, 2020]

JUSTICE THOMAS, concurring in the judgment.

The Court reaches the right conclusion: The appointment process for members of the Financial Oversight and Management Board for Puerto Rico (Board) does not violate the Appointments Clause.  I cannot agree, however, with the ill-defined path that the Court takes to reach this result.  I would resolve these cases based on the original public meaning of the phrase "Officers of the United States" in the Appointments Clause.

I

The Appointments Clause provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law."  Art. II, §2, cl. 2.  The Clause also permits Congress to vest the appointment of "inferior Officers" in "the President alone," "the Courts of Law," or "the Heads of Departments."  *Ibid.*

As I have previously explained, the original public meaning of the phrase "Officers of the United States" includes "all federal civil officials who perform an ongoing, statutory duty."  *Lucia* v. *SEC*, 585 U. S. ___, ___ (2018) (THOMAS, J., concurring) (slip op., at 2) (citing Mascott, Who Are "Officers of the United States"? 70 Stan. L. Rev. 443, 454 (2018) (Mascott)).  At the founding, the term "officer" referred to "anyone who performed a continuous public duty."  585 U. S*.,* at ___ (slip op., at 3).  And the phrase "of the United States" limited the Appointments Clause to "federal" officers.  *Ibid.*; see Mascott 471–479.

II

Territorial officials performing duties created under Article IV of the Constitution are not federal officers within

the original meaning of the phrase "Officers of the United States." Since the founding, this Court has recognized a distinction between Article IV power and the powers of the National Government in Articles I, II, and III. The founding generation understood the phrase "Officers of the United States" to refer to officers exercising the powers of the National Government, not officers solely exercising Article IV territorial power. Because the Board's members perform duties pursuant to Article IV, they do not qualify as "Officers of the United States."

## A

The Territory Clause of Article IV provides Congress the "Power to dispose of and make all needful Rules and Regulations respecting the Territory . . . belonging to the United States." §3, cl. 2. This power is "absolute and undisputed." *Sere* v. *Pitot*, 6 Cranch 332, 337 (1810). Congress has "full and complete legislative authority over the people of the Territories and all the departments of the territorial governments." *National Bank* v. *County of Yankton*, 101 U. S. 129, 133 (1880).

"No one has ever doubted the authority of congress to erect territorial governments within the territory of the United States, under the general language of the clause, 'to make all needful rules and regulations.'" 3 J. Story, Commentaries on the Constitution of the United States §1319, p. 195 (1833). These governments are "the creations, exclusively, of [Congress], and subject to its supervision and control." *Benner* v. *Porter*, 9 How. 235, 242 (1850).[1]

_____

[1] The Court of Appeals attempted to draw a distinction between power exercised pursuant to territorial laws enacted by Congress and power exercised pursuant to territorial laws enacted by a territorial legislature. There is no meaningful distinction in this context. While the legislature of the Territory may establish laws for the Territories, Article IV remains the "ultimate source" of territorial power. *Puerto Rico* v. *Sánchez Valle*,

Because territorial governments "are not organized un-
der the Constitution," they are not "subject to its complex
distribution of the powers of government." *Ibid.* Congress
may give Territories "a legislative, an executive, and a judi-
ciary, with such powers as it has been their will to assign."
*Sere*, 6 Cranch, at 337. And, since the founding, Congress
has done so in ways that do not comport with the Constitu-
tion's restrictions on the National Government. For exam-
ple, Congress has delegated Article IV legislative authority
to territorial officials and legislatures,[2] which it could not

––––––––––

579 U. S. ___, ___ (2016) (slip op., at 15) (internal quotation marks omit-
ted). Congress is the source of the "entire dominion and sovereignty" of
a Territory, *Simms* v. *Simms*, 175 U. S. 162, 168 (1899), and therefore
all territorial laws, whether congressionally enacted or territorially en-
acted, derive from Article IV, *Sánchez Valle*, 579 U. S., at ___ (slip op., at
15) (recognizing that the "most immediate source of [the] authority" does
not change the nature of the power exercised).

[2] See, *e.g.,* Act of Aug. 7, 1789, 1 Stat. 51, and n. (*a*) (Northwest Terri-
tory); Act of May 26, 1790, ch. 14, §1, 1 Stat. 123 (Southwest Territory);
Act of Apr. 7, 1798, §3, 1 Stat. 550 (Mississippi); Act of May 7, 1800, §§2,
4, 2 Stat. 59 (Indiana); Act of Mar. 26, 1804, §4, 2 Stat. 284 (Louisiana);
Act of Jan. 11, 1805, ch. 5, §2, 2 Stat. 309 (Michigan); Act of Mar. 2, 1805,
§§1, 2, 2 Stat. 322 (Orleans); Act of Feb. 3, 1809, §§2, 4, 2 Stat. 515 (Illi-
nois); Act of June 4, 1812, §4, 2 Stat. 744 (Missouri); Act of Mar. 3, 1817,
§4, 3 Stat. 372 (Alabama); Act of Mar. 2, 1819, §5, 3 Stat. 494 (Arkansas);
Act of Mar. 30, 1822, §5, 3 Stat. 655 (Florida); Act of Mar. 3, 1823, §5, 3
Stat. 751 (Florida); Act of Apr. 20, 1836, §4, 5 Stat. 12 (Wisconsin); Act
of June 12, 1838, §4, 5 Stat. 236 (Iowa); Act of Aug. 14, 1848, §4, 9 Stat.
324 (Oregon); Act of Mar. 3, 1849, §4, 9 Stat. 404 (Minnesota); Act of
Sept. 9, 1850, §5, 9 Stat. 448 (New Mexico); Act of Sept. 9, 1850, §4, 9
Stat. 454 (Utah); Act of Mar. 2, 1853, §4, 10 Stat. 173 (Washington); Act
of May 30, 1854, §§4–6, 22–24, 10 Stat. 278–279, 284–285 (Nebraska and
Kansas); Act of Feb. 28, 1861, §4, 12 Stat. 173 (Colorado); Act of Mar. 2,
1861, §4, 12 Stat. 210–211 (Nevada); Act of Mar. 2, 1861, §4, 12 Stat. 240
(Dakota); Act of Feb. 24, 1863, ch. 56, §2, 12 Stat. 665 (Arizona); Act of
Mar. 3, 1863, §4, 12 Stat. 809 (Idaho); Act of May 26, 1864, §4, 13 Stat.
87 (Montana); Act of July 25, 1868, §4, 15 Stat. 179 (Wyoming); Act of
May 2, 1890, §4, 26 Stat. 83 (Oklahoma); Act of Apr. 12, 1900, §27, 31
Stat. 82 (Puerto Rico); Act of Apr. 30, 1900, §12, 31 Stat. 144 (Hawaii);
Act of July 1, 1902, §7, 32 Stat. 693–694 (Philippines); Act of Aug. 24,
1912, §4, 37 Stat. 513 (Alaska); Act of June 22, 1936, §5, 49 Stat. 1808

do with Article I legislative power. See *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 472 (2001); *Department of Transportation* v. *Association of American Railroads*, 575 U. S. 43, 67–88 (2015) (THOMAS, J., concurring in judgment). It has also established territorial courts that do not comply with Article III. See Baude, Adjudication Outside Article III, 133 Harv. L. Rev. 1511, 1525–1530 (2020) (analyzing territorial courts in early Territories).

The powers vested in territorial governments are distinct from the powers of the National Government. Territorial legislatures exercise the legislative power of the Territory, not Article I legislative power. *Cincinnati Soap Co.* v. *United States*, 301 U. S. 308, 322–323 (1937). Territorial officials exercise the executive power of the Territory, not Article II executive power. *Snow* v. *United States*, 18 Wall. 317, 321–322 (1873). And territorial courts exercise the judicial power of the Territory, not the "judicial power of the United States" under Article III. *American Ins. Co.* v. *356 Bales of Cotton*, 1 Pet. 511, 546 (1828); *Clinton* v. *Englebrecht*, 13 Wall. 434, 447 (1872).

B

Given the distinction between territorial and national powers, the question becomes whether officers exercising Article IV territorial power are officers "of the United States" under the original meaning of the Appointments Clause. They are not. Both the text of the Appointments Clause and historical practice support this conclusion.

1

The text of the Appointments Clause indicates that "Officers of the United States" refers to officers exercising the powers of the National Government, not officers exercising territorial power. The Clause applies to the appointment of

_____

(Virgin Islands); Act of Aug. 1, 1950, §10, 64 Stat. 387 (Guam).

"Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States." Art. II, §2, cl. 2. Each of the officers specifically mentioned in the Clause—"Ambassadors," "public Ministers," "Consuls," and "Judges of the supreme Court"—holds an office that exercises national power. *Ibid.* Although not dispositive, this fact suggests that the phrase "and all other Officers of the United States" refers to "other" officers of the National Government. See *Beecham* v. *United States*, 511 U. S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well"); see also A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 195–198 (2012) (discussing the "associated-words canon," also known as *noscitur a sociis*).

2

Historical evidence from the founding era confirms that officers exercising Article IV territorial power are not "Officers of the United States." The Court acknowledges some of this evidence and surveys the history of appointments in Puerto Rico. *Ante,* at 8–14. I, however, would give more weight and focus to the practices of the First Congress, which provide "powerful evidence of the original understanding of the Constitution." *Comptroller of Treasury of Md.* v. *Wynne,* 575 U. S. 542, 580 (2015) (THOMAS, J., dissenting) (compiling cases relying on the practices of the First Congress to interpret the Constitution).

Before the Constitution's ratification, the Northwest Ordinance of 1787 set up a territorial government for the Northwest Territory. Act of Aug. 7, 1789, 1 Stat. 51, n. (*a*) (reproducing the Northwest Ordinance of 1787 enacted by the Continental Congress). This ordinance granted Congress the power to appoint the Northwest Territory's Governor, secretary, judges, and general militia officers. *Ibid.*

And it provided the Governor the power to appoint "magistrates and other civil officers" of the Territory. *Ibid.*

In 1789, after the ratification of the Constitution, the First Congress amended the Northwest Ordinance "to adapt [it] to the present Constitution of the United States." *Id.,* at 51. One of these amendments provided that "the President shall nominate, and by and with the advice and consent of the Senate, shall appoint all officers which by the said ordinance were to have been appointed by the United States in Congress assembled, and all officers so appointed shall be commissioned by him." *Id.,* at 53. The officers not previously designated for congressional appointment, including "magistrates and other civil officers," remained subject to appointment by the Governor. *Id.,* at 51, n. (*a*), and 53. These amendments (and lack thereof) provide strong evidence that the First Congress understood the distinction between territorial officers and officers of the National Government.

As the Court recognizes, Congress revised the Northwest Ordinance to require "a Presidential-appointment, Senate-confirmation process for high-level territorial appointees who assumed *federal, as well as local, duties.*" *Ante,* at 8 (emphasis added). For example, Congress revised the appointment process for the Governor of the Northwest Territory, who performed duties under the powers of the National Government in addition to his Article IV territorial duties. The Governor "discharg[ed] the duties of superintendent of Indian affairs," Act of Sept. 11, 1789, ch. 13, §1, 1 Stat. 68, which required him to execute congressional regulations, manage trade with Indians, and obey instructions received from the Secretary of War with respect to his duties as superintendent. See Ordinance for the Regulation of Indian Affairs (Aug. 7, 1786); see also F. Prucha, American Indian Policy in the Formative Years: The Indian Trade and Intercourse Acts 1790–1834, p. 36 (1962). The Governor negotiated treaties with Indians on behalf of the United

States.  See 2 The Papers of George Washington: Presidential Series 196–198 (D. Twohig ed. 1987); 33 Journals of the Continental Congress, 1774–1789, p. 711 (R. Hill ed. 1936). He even had the power to call on the militia of the States in the President's name to prevent "incursions of the hostile Indians."  2 The St. Clair Papers 125 (W. Smith ed. 1882). Thus, at least with respect to the Governor, who wielded powers of the National Government, the First Congress appears to have modified the Northwest Ordinance to ensure its compliance with the Appointments Clause.

In contrast, Congress did not revise the process for appointing "magistrates and other civil officers," who remained subject to appointment by the Governor.  1 Stat. 51, n. (*a*), and 53.  The "magistrates and other civil officers" of the Northwest Territory included justices of the peace, clerks of the court, sheriffs, coroners, surveyors, and notaries.  3 The Territorial Papers of the United States: The Territory Northwest of the River Ohio, 1787–1803, pp. 304–307 (C. Carter ed. 1934).  If these officials were exercising a statutory duty under the powers of the National Government, they would have certainly been considered "Officers of the United States" under the Appointments Clause.  See Mascott 484–507, 510–515.  "The Founders considered individuals to be officers even if they performed only ministerial statutory duties—including recordkeepers, clerks, and tidewaiters (individuals who watched goods land at a customhouse)."  *Lucia*, 585 U. S., at ___ (THOMAS, J., concurring) (slip op., at 3).  But "the powers and duties of magistrates and other civil officers [were] regulated and defined by the [territorial] assembly," 1 Stat. 51, n. (*a*), and therefore were necessarily exercised pursuant to Article IV, see *supra,* at 3–5.  It is evident that the First Congress did not consider these officials to be "Officers of the United States," because it allowed appointment by an official who is not the "hea[d] of a department."  See *United States* v. *Germaine*, 99 U. S. 508, 510 (1879).

One cannot plausibly conclude that the First Congress—seeking to "adapt" the Northwest Ordinance to the Constitution, 1 Stat. 51—prescribed methods of appointing territorial officers that violated the Appointments Clause. Rather, the First Congress recognized the distinction between territorial and national powers, see *supra,* at 6–8, and understood that officers performing duties pursuant to only Article IV territorial powers are not officers "of the United States." For these reasons, I would hold that the original meaning of the phrase "Officers of the United States" does not include territorial officers exercising only powers conferred under Article IV.

## C

Under the original meaning of the Appointments Clause, the Board's members are not "Officers of the United States." They are territorial officers exercising power granted under Article IV.

The Board is "an entity within the territorial government," 48 U. S. C. §2121(c)(1), created "pursuant to article IV, section 3 of the Constitution of the United States," §2121(b)(2), and funded by the Territory, §2127(b). The members of the Board perform duties involving the oversight of Puerto Rico's finances and fiscal reform efforts, §§2141–2152, and the representation of Puerto Rico in debt restructuring proceedings, §§2161–2177. Because "they do not exercise the national executive power," "national judicial power," or national legislative power, the Board's members are "Article IV executives," not Officers of the United States under the Appointments Clause. See *Freytag* v. *Commissioner*, 501 U. S. 868, 913 (1991) (Scalia, J., concurring in part and concurring in judgment) (emphasis deleted).

The Court rightfully acknowledges the territorial nature of the Board's duties. *Ante,* at 14–20. But in the process,

the Court sets up a dichotomy between officers with "primarily local versus primarily federal" duties. *Ante,* at 18 (emphasis deleted). I cannot agree with this amorphous test.

As an initial matter, the Court need not decide whether an officer exercising both national and Article IV powers qualifies as an "Officer of the United States." The Board's members have responsibility for ongoing statutory duties that are entirely within the scope of Article IV. See *ante,* at 14–20.

Resolving this unnecessary issue is especially problematic because the original meaning of the phrase "Officers of the United States" arguably includes all officers exercising the powers of the National Government, even if those officers also exercise power vested under Article IV. The Governor of the Northwest Territory, for example, seems to have performed "primarily local" duties, yet the First Congress believed the Governor was an "Officer of the United States" subject to the restrictions of the Appointments Clause. *Supra,* at 7–8; see also *ante,* at 8.

The Court fails to engage with this point. Indeed, it fails to provide any foundation at all for its "primarily local" rule. The only analysis to be found is a conclusory statement that *Palmore* v. *United States,* 411 U. S. 389 (1973), "provides a rough analogy." *Ante*, at 19. But drawing a rule from a case that is "no[t] . . . directly on point," *ibid.*, without even analyzing the underlying reasoning of that case, is not sound constitutional interpretation. And favoring a tangentially related decision from 1973 over the practices of the First Congress is certainly not "more faithful to the [Appointment] Clause's original meaning," *ante,* at 21.

Finally, the Court fails to provide any explanation for what makes an officer's duties "primarily local." *Ante*, at 14–20. Is it the relative importance of the duties? Or is it the number of duties exercised pursuant to each power? And what ratio is required for duties to be primarily local?

The Court's opinion has no answers and does not even acknowledge the questions. And, regardless of how these questions are resolved, the primarily local test allows Congress to evade the requirements of the Appointments Clause by supplementing an officer's federal duties with sufficient territorial duties, such that they become "primarily local," whatever that means.

*    *    *

Today's decision reaches the right outcome, but it does so in a roundabout way that departs from the original meaning of the Appointments Clause. I would hold that the Board's members are not "Officers of the United States" because they perform ongoing statutory duties under only Article IV. I therefore cannot join the Court's opinion and concur only in the judgment.

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 18–1334, 18–1475, 18–1496, 18–1514 and 18–1521

———————

FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, PETITIONER
18–1334          *v.*
AURELIUS INVESTMENT, LLC, ET AL.


AURELIUS INVESTMENT, LLC, ET AL., PETITIONERS
18–1475          *v.*
COMMONWEALTH OF PUERTO RICO, ET AL.


OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OF ALL TITLE III DEBTORS OTHER
THAN COFINA, PETITIONER
18–1496          *v.*
AURELIUS INVESTMENT, LLC, ET AL.


UNITED STATES, PETITIONER
18–1514          *v.*
AURELIUS INVESTMENT, LLC, ET AL.


UNIÓN DE TRABAJADORES DE LA INDUSTRIA
ELÉCTRICA Y RIEGO, INC., PETITIONER
18–1521          *v.*
FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[June 1, 2020]

JUSTICE SOTOMAYOR, concurring in the judgment.

Nearly 60 years ago, the people of Puerto Rico "embark[ed] on [a] project of constitutional self-governance" after entering into a compact with the Federal Government. *Puerto Rico* v. *Sánchez Valle*, 579 U. S. ___, ___ (2016) (slip op., at 3). At the conclusion of that endeavor, the people of Puerto Rico established, and the United States Congress recognized, a "republican form of government" "pursuant to a constitution of [the Puerto Rican population's] own adoption." Act of July 3, 1950, ch. 446, §§1, 2, 64 Stat. 319; see also Act of July 3, 1952, 66 Stat. 327. One would think the Puerto Rican home rule that resulted from that mutual enterprise might affect whether officers later installed by the Federal Government are properly considered officers of Puerto Rico rather than "Officers of the United States" subject to the Appointments Clause. U. S. Const., Art. II, §2, cl. 2. Yet the parties do not address that weighty issue or any attendant questions it raises. I thus do not resolve those matters here and instead concur in the judgment.

I nevertheless write to explain why these unexplored issues may well call into doubt the Court's conclusion that the members of the Financial Oversight and Management Board for Puerto Rico are territorial officers not subject to the "significant structural safeguards" embodied in the Appointments Clause. *Edmond* v. *United States*, 520 U. S. 651, 659 (1997). Puerto Rico's compact with the Federal Government and its republican form of government may not alter its status as a Territory. But territorial status should not be wielded as a talismanic opt out of prior congressional commitments or constitutional constraints.

I

A

Puerto Rico became a Territory of the United States in 1898, pursuant to a treaty concluding the Spanish-American War. After a series of temporary military governing measures, Congress passed the Foraker Act of 1900,

establishing a civil government exercising significant authority over Puerto Rico's internal territorial affairs. Organic Act of 1900, ch. 191, 31 Stat. 77. Over time, Congress put in place incremental measures of autonomy, such as by granting U. S. citizenship to the island's inhabitants in 1917 and providing for the popular election of certain territorial officials the same year. See *Sánchez Valle*, 579 U. S., at \_\_\_–\_\_\_ (slip op., at 2–3); Organic Act of 1917, ch. 145, 39 Stat. 951. Yet throughout the early years of Puerto Rico's territorial status, "Congress retained major elements of sovereignty," and "[i]n cases of conflict, Congressional statute, not Puerto Rico law, would apply no matter how local the subject." *Cordova & Simonpietri Ins. Agency Inc.* v. *Chase Manhattan Bank N. A.*, 649 F. 2d 36, 39 (CA1 1981) (Breyer, J., for the court).

By 1950, however, international and local "pressures for greater autonomy," *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U. S. 663, 671 (1974), prompted Congress to pass Public Law 600, 64 Stat. 319, a measure "enabl[ing] Puerto Rico to embark on the project of constitutional self-governance," *Sánchez Valle*, 579 U. S., at \_\_\_ (slip op., at 3). "'[R]ecognizing'" and "affirm[ing] the 'principle of government by consent,'" Public Law 600 "offered the Puerto Rican public a 'compact,' under which they could 'organize a government pursuant to a constitution of their own adoption.'" *Id.*, at \_\_\_, \_\_\_ (slip op., at 3, 16) (quoting Act of July 3, 1950, §1, 64 Stat. 319); see also 579 U. S., at \_\_\_ (slip op., at 3) (Public Law 600 "[d]escrib[ed] itself as 'in the nature of a compact'" (quoting §1, 64 Stat. 319)). Under the terms of the compact, Public Law 600 itself was submitted to the people of Puerto Rico, who voted to approve the law through a popular referendum. See Leibowitz, The Applicability of Federal Law to the Commonwealth of Puerto Rico, 56 Geo. L. J. 219, 222–223 (1967). Delegates were then elected to a constitutional convention to draft a constitution, and in a special referendum, the draft constitution was submitted to

the people of Puerto Rico for approval. *Id.*, at 223.

In 1952, "both Puerto Rico and the United States ratified Puerto Rico's Constitution." *Sánchez Valle*, 579 U. S., at ___ (BREYER, J., dissenting) (slip op., at 8). The people of Puerto Rico first approved the draft Constitution in a referendum. Congress then approved the draft Constitution with modifications, noting the caveat that it "shall become effective" only when Puerto Rico "declare[s] in a formal resolution its acceptance." 66 Stat. 327–328. Finally, the constitutional convention approved the modified Constitution, and the people of Puerto Rico subsequently ratified modifications in another referendum. Thus, although the terms of the compact provided for Congress' approval, "when such constitution did go into effect pursuant to the resolution of approval by the Congress, it became what the Congress called it, a 'constitution' under which the people of Puerto Rico organized a government of their own adoption." *Figueroa* v. *Puerto Rico*, 232 F. 2d 615, 620 (CA1 1956) (citation omitted). "The Commonwealth's power, the [Puerto Rico] Constitution proclaims, 'emanates from the people and shall be exercised in accordance with their will, within the terms of the compact agreed upon between the people of Puerto Rico and the United States.'" *Sánchez Valle*, 579 U. S., at ___ (slip op., at 4).

With the passage of Public Law 600 and the adoption and recognition of the Puerto Rico Constitution, "the United States and Puerto Rico . . . forged a unique political relationship, built on the island's evolution into a constitutional democracy exercising local self-rule." *Id.*, at ___ (slip op., at 2); cf. *Calero-Toledo*, 416 U. S., at 672 (noting with approval the view that, after Public Law 600, Puerto Rico became "a political entity created by the act and with the consent of the people of Puerto Rico and joined in union with the United States of America under the terms of the compact" (quoting *Mora* v. *Mejias*, 206 F. 2d 377, 387 (CA1 1953))).

Of critical import here, the Federal Government "relinquished its control over [Puerto Rico's] local affairs[,]

grant[ing] Puerto Rico a measure of autonomy comparable to that possessed by the States." *Examining Bd. of Engineers, Architects and Surveyors* v. *Flores de Otero*, 426 U. S. 572, 597 (1976). Indeed, the very "purpose of Congress in the 1950 and 1952 legislation was to accord Puerto Rico the degree of autonomy and independence normally associated with States of the Union." *Id.*, at 594; see also S. Rep. No. 1779, 81st Cong., 2d Sess., 2 (1950) (Public Law 600 was "designed to complete the full measure of local self-government in" Puerto Rico); H. R. Rep. No. 2275, 81st Cong., 2d Sess., 6 (1950) (Public Law 600 was a "reaffirmation by the Congress of the self-government principle").[1] The upshot is that "Puerto Rico, like a State, is an autonomous political entity, '"sovereign over matters not ruled by the [Federal] Constitution."'" *Rodriguez* v. *Popular Democratic Party*, 457 U. S. 1, 8 (1982) (quoting *Calero-Toledo*, 416 U. S., at 673). And only by holding out that guarantee to the United Nations has the Federal Government been able to disclaim certain continuing obligations it previously owed with respect to Puerto Rico under the United Nations Charter. See *infra*, at 11–12.

## B

In the decades that followed, Puerto Rico underwent further changes as a Commonwealth. For many years, the island experienced dynamic growth, increasing its gross national product more than fourfold from 1950 to 1971. Cheatham, Council on Foreign Relations, Puerto Rico: A U. S. Territory in Crisis (Feb. 13, 2020). In 1976, after the

---

[1] To be sure, Public Law 600 reserved certain limited powers to Congress (some of which were soon repealed). See *ante*, at 12–13. But those narrow reservations of federal control did not purport to diminish the full measure of territorial self-governance conferred upon the people of Puerto Rico through Public Law 600 and the Puerto Rico Constitution. See 39 Stat. 953; 64 Stat. 319–320.

revised Federal Tax Code conferred preferential tax treat-
ment on productive industries in Puerto Rico, Puerto Rico
developed robust pharmaceutical and manufacturing sec-
tors.    Issacharoff, Bursak, Rennie, & Webley, What Is
Puerto Rico? 94 Ind. L. J. 1, 27 (2019).

Eventually, however, the island and its people confronted
several economic setbacks.  Congress repealed Puerto Rico's
favorable tax credits, and manufacturing growth deflated,
precipitating a prolonged recession.  Steady outmigration
correlated with persistently high unemployment rates
greater than 8 percent.  Dept. of Labor, Bureau of Labor
Statistics, Databases, Tables & Calculators by Subject
(May 28, 2020).  Deprived of its primary sources of income,
the Commonwealth began borrowing heavily.  The island's
outstanding debts rose to approximately $70 billion, a sum
greater than its annual economic output.  Puerto Rico's
credit ratings were downgraded to junk levels, D. Austin,
Congressional Research Service, Puerto Rico's Current Fis-
cal Challenges 4, 13 (June 3, 2016), rendering borrowing
practically impossible.  Without any realistic ability to set
its finances on the right course, the island declared bank-
ruptcy in 2016.

Months later, Hurricane Maria made landfall, causing
immense devastation and a humanitarian emergency the
likes of which had not been seen in over a century.  The
island suffered thousands of casualties and an estimated
$90 billion in damages.  Most recently, significant earth-
quakes have further rattled an already shaken population
and economy still recovering from the impact of Hurricane
Maria.  Robles, Months After Puerto Rico Earthquakes,
Thousands Are Still Living Outside, N. Y. Times, Mar. 1,
2020.

C

Congress passed the Puerto Rico Oversight, Manage-
ment, and Economic Stability Act (PROMESA), 130 Stat.

549, 48 U. S. C. §2101 *et seq.*, in the midst of Puerto Rico's dramatic reversal of fortune, with the aim of mitigating the island's "severe economic decline," see 48 U. S. C. §2194(m)(1). To that end, the statute establishes a Financial Oversight and Management Board to oversee the island's finances and restructure its debts. See *ante*, at 3–4; Issacharoff, 94 Ind. L. J., at 30–31.

The Board's decisions have affected the island's entire population, particularly many of its most vulnerable citizens. The Board has ordered pensions to be reduced by as much as 8.5 percent, a measure that threatens the sole source of income for thousands of Puerto Rico's poor and elderly. Walsh & Russell, $129 Billion Puerto Rico Bankruptcy Plan Could Be Model for States, N. Y. Times, Sept. 29, 2019. Other proposed cuts take aim at already depleted healthcare and educational services. It is under the yoke of such austerity measures that the island's 3.2 million citizens now chafe.

PROMESA does not provide for the appointment of Board members according to the straightforward methods set out in the Appointments Clause. U. S. Const., Art. II, §2, cl. 2 (requiring principal "Officers of the United States" to be nominated by the President, with Senate advice and consent). Instead, the statute prescribes a labyrinthine procedure by which the Speaker of the House, majority leader of the Senate, minority leader of the House, and minority leader of the Senate each submit to the President separate lists with any number of candidates; and the President, in turn, selects individuals from each of those lists, plus an individual in his sole discretion. See §101(e), 130 Stat. 554–555.[2] With only one exception, then, the President is not

———————
[2] Specifically, PROMESA provides that "[t]he Board shall be comprised of one Category A member, one Category B member, two Category C members, one Category D member, one Category E member, and one Category F member." §101(e)(1)(B), 130 Stat. 554. The Speaker of the House submits "separate, non-overlapping list[s]" for the Category A and

"singly and absolutely" responsible for any members of the Board. The Federalist No. 77, p. 461 (C. Rossiter ed. 1961) (A. Hamilton) (Appointments Clause ensures that "[t]he blame of a bad nomination . . . fall[s] upon the President singly and absolutely"). And with no exceptions, the Senate fails to advise or consent to the President's selections.

Despite the Board's wide-ranging, veto-free authority over Puerto Rico, the solitary role PROMESA contemplates for Puerto Rican-selected officials is this: The Governor of Puerto Rico sits as an ex officio Board member without any voting rights. §101(e)(3), 130 Stat. 555. No individual within Puerto Rico's government plays any part in determining which seven members now decide matters critical to the island's financial fate.

## II

### A

In concluding that the Board members are territorial officers not subject to the strictures of the Appointment Clause, the Court does not meaningfully address Puerto Rico's history or status. Nor need it, as the parties do not discuss the potential consequences that Congress' recognition of complete self-government decades ago may have on the Appointments Clause analysis. But in my view, however one distinguishes territorial officers from federal officers (whether under the Court's "primarily local" test, *ante*, at 14, or some other standard), the longstanding compact between the Federal Government and Puerto Rico raises

_____

Category B members, the majority leader for the Senate submits a list for the two Category C members, the majority leader of the House submits a list for the Category D member, and the minority leader of the Senate submits a list for the Category E member. §101(e)(2)(A), *id.*, at 554–555. Finally, "the Category F member may be selected in the President's sole discretion." §101(e)(2)(A)(vi), *id.*, at 555. Many other conditions apply to the lists submitted and the individuals who may appear on them. See generally §§101(e)–(f), *id.*, at 554–556.

grave doubts as to whether the Board members are territorial officers not subject to the Appointments Clause. When Puerto Rico and Congress entered into a compact and ratified a constitution of Puerto Rico's adoption, Congress explicitly left the authority to choose Puerto Rico's governmental officers to the people of Puerto Rico. That turn of events seems to give to Puerto Rico, through a voluntary concession by the Federal Government, the exclusive right to establish Puerto Rico's own territorial officers.

No less than the bedrock principles of government upon which this Nation was founded ground this proposition. When the Framers resolved to build this Nation on a republican form of government, they understood that the American people would have the authority to select their own governmental officers. See, *e.g.*, The Federalist No. 39, at 251 (J. Madison) ("[W]e may define a republic to be . . . a government which derives all its powers directly or indirectly from the great body of the people"); A. Amar, America's Constitution: A Biography 278–279 (2005) ("[T]he general understanding of republicanism across America" at the founding embraced a concept of government "in which 'the people are sovereign'; in which 'the people are consequently the fountain of all power'; in which 'all authority should flow from the people'"). Core to the 1950s "compact" between the Federal Government and Puerto Rico was that Puerto Rico's eventual constitution "shall provide a republican form of government." §2, 64 Stat. 319 (codified in 48 U. S. C. §731c). Thus, "resonant of American founding principles," the Puerto Rico Constitution set forth a tripartite government "'republican in form' and 'subordinate to the sovereignty of the people of Puerto Rico.'" *Sánchez Valle*, 579 U. S., at ___ (slip op., at 4) (quoting P. R. Const., Art. I, §2); see also *Torres* v. *Puerto Rico*, 442 U. S. 465, 470 (1979). "[T]he distinguishing feature" of such "republican form of government," this Court has recognized over and again, "is

the right of the people to choose their own officers for governmental administration, and pass their own laws in virtue of the legislative power reposed in representative bodies, whose legitimate acts may be said to be those of the people themselves." *In re Duncan*, 139 U. S. 449, 461 (1891) (discussing the republican governments of the States); see also *Pacific States Telephone & Telegraph Co.* v. *Oregon*, 223 U. S. 118, 149 (1912) (same).

Thus, whatever authority the Federal Government exercised to select territorial officers for Puerto Rico before Congress recognized Puerto Rico's republican form of government, the authority "to choose [Puerto Rico's] own officers for governmental administration" now seems to belong to the people of Puerto Rico. *Duncan*, 139 U. S., at 461. Indeed, however directly responsible the Federal Government was for Puerto Rico's local affairs before Public Law 600, those matters might be said to "now procee[d]" in the first instance "from the Puerto Rico Constitution as 'ordain[ed] and establish[ed]' by 'the people.'" Cf. *Sánchez Valle*, 579 U. S., at ___ (slip op., at 15) (quoting P. R. Const., Preamble) (acknowledging "that the Commonwealth's power to enact and enforce criminal law now proceeds . . . from the Puerto Rico Constitution," "mak[ing] the Puerto Rican populace . . . the most immediate source of such authority").

The developments of the early 1950s were not merely symbolic either; this Court has recognized that the paradigm shift in relations between Puerto Rico and the Federal Government carried legal consequences. In *Calero-Toledo*, for instance, this Court held that the "enactments of the Commonwealth of Puerto Rico" were "'State statute[s]'" within the meaning of a federal law requiring a three-judge court panel to consider any action seeking to enjoin a "'State statute.'" 416 U. S., at 675–676. The Court reasoned that Puerto Rico was entitled to similar treatment as the States under the federal law, due to "significant changes in Puerto Rico's governmental structure" in the early 1950s. See *id.*,

at 670–674. For similar reasons, this Court has recognized on multiple other occasions that Puerto Rico is akin to a State in key respects. See, *e.g.*, *Flores de Otero*, 426 U. S., at 597 (Congress granted Puerto Rico "a measure of autonomy comparable to that possessed by the States"); *Rodriguez*, 457 U. S., at 8 ("Puerto Rico, like a state, is an autonomous political entity"); see also *Sánchez Valle*, 579 U. S., at \_\_\_ (BREYER, J., dissenting) (slip op., at 3) ("[T]he parallels between admission of new States and the creation of the Commonwealth [of Puerto Rico] are significant").

The compact also had international ramifications, as the Federal Government repeatedly represented at the time. Shortly after the ratification and approval of the Puerto Rico Constitution, federal officials certified to the United Nations that, for Puerto Rico, the United States no longer needed to comply with certain reporting obligations under the United Nations Charter regarding territories "whose peoples have not yet attained a full measure of self-government." Charter of the United Nations, 59 Stat. 1048, Art. 73, June 26, 1945, T. S. No. 993 (U. N. Charter). According to federal officials, that was because the people of Puerto Rico now had "complete autonomy in internal economic matters and in cultural and social affairs under a Constitution adopted by them and approved by the Congress." Memorandum by the Government of the United States of America Concerning the Cessation of Transmission of Information Under Article 73(e) of the Charter With Regard to the Commonwealth of Puerto Rico, in A. Fernós-Isern, Original Intent in the Constitution of Puerto Rico 153 (2d ed. 2002). To the extent federal law had previously "directed or authorized interference with matters of local government by the Federal Government," federal officials elaborated, "[t]hose laws . . . ha[d] been repealed." *Ibid.*; see also *ibid.* ("Congress has agreed that Puerto Rico shall have, under [the Puerto Rico] Constitution, freedom from

control or interference by the Congress in respect of internal government and administration").

Based on those explicit representations, the United Nations General Assembly declared that the people of Puerto Rico "ha[d] been invested with attributes of political sovereignty which clearly identify the status of self-government attained . . . as that of an autonomous political entity." G. A. Res. 748, U. N. GAOR, 8th Sess., Supp. No. 17, U. N. Doc. A/2630 (Nov. 27, 1953). And consistent with that declaration, the Federal Government promptly stopped complying with the Charter's reporting obligations with respect to Puerto Rico (and has never since recommenced). Thus, in the eyes of the international community looking in, as well as of the Federal Government looking out, Puerto Rico has long enjoyed autonomous reign over its internal affairs. Indeed, were the Federal Government's representations to the United Nations merely aspirational, the United States' compliance with its international legal obligations would be in substantial doubt. See Lawson & Sloane, The Constitutionality of Decolonization by Associated Statehood: Puerto Rico's Legal Status Reconsidered, 50 Boston College L. Rev. 1123, 1127 (2009) (arguing that if Puerto Rico remains "just another territory subject to Congress' plenary power under the Territories Clause," "the United States . . . is in violation of its international legal obligations vis-à-vis Puerto Rico").

There can be little question, then, that the compact altered the relationship between the Federal Government and Puerto Rico. At a minimum, the post-compact developments, including this Court's precedents, indicate that Congress placed in the hands of the Puerto Rican people the authority to establish their own government, replete with officers of their own choosing, and that this grant of self-government was not an empty promise. That history prompts serious questions as to whether the Board members may be territorial officers of Puerto Rico when they are

not elected or approved, directly or indirectly, by the people
of Puerto Rico.

B

Of course, it might be argued that Congress is neverthe-
less free to repeal its grant of self-rule, including the grant
of authority to the island to select its own governmental of-
ficers. And perhaps, it might further be said, that is exactly
what Congress has done in PROMESA by declaring the
Board "an entity within the territorial government" of
Puerto Rico. §101(c)(1), 130 Stat. 553. But that is not so
certain.

This Court has "'repeatedly stated . . . that absent "a
clearly expressed congressional intention"'" to repeal,
"'[a]n implied repeal will only be found where provisions in
two statutes are in "irreconcilable conflict," or where the
latter Act covers the whole subject of the earlier one and "is
clearly intended as a substitute."'" *Carcieri* v. *Salazar*, 555
U. S. 379, 395 (2009) (quoting *Branch* v. *Smith*, 538 U. S.
254, 273 (2003) (plurality opinion)). Not so, it seems, with
PROMESA on the one hand, and Congress' 1950 and 1952
legislations on the other. As written, PROMESA is a tem-
porary bankruptcy measure intended to assist in restoring
Puerto Rico to fiscal security. It is not an organic statute
clearly or expressly purporting to renege on Congress' prior
"gran[t to] Puerto Rico [of] a measure of autonomy compa-
rable to that possessed by the States," *Flores de Otero*, 426
U. S., at 597, nor on the concomitant grant of authority to
select officers of its own choosing. It would seem curious to
interpret PROMESA as having done so indirectly, simply
through its characterization of the Board "as an entity
within the territorial government." §101(c)(1), 130 Stat.
553.

Further, there is a legitimate question whether Congress
could validly repeal any element of its earlier compact with

Puerto Rico on its own initiative, even if it had been abundantly explicit in its intention to do so. The truism that "one Congress cannot bind a later Congress," *Dorsey* v. *United States*, 567 U. S. 260, 274 (2012), appears to have its limits: As scholars have noted, certain congressional actions are not subject to recantation. See, *e.g.*, Magruder, The Commonwealth Status of Puerto Rico, 15 U. Pitt. L. Rev. 1, 14 (1953) (listing as examples the congressional grant of independence to the Philippine Islands and congressional grant of private title to public lands under homestead laws); Issacharoff, 94 Ind. L. J., at 14 ("Once a Congress has disposed of a territory, of necessity it binds future Congresses to the consequences of that decision"); T. Aleinikoff, Semblances of Sovereignty: The Constitution, the State, and American Citizenship 90 (2002) ("The granting of neither statehood nor independence may be revoked, nor may land grants or other 'vested interests' be called back by a subsequent Congress").

Plausible reasons may exist to treat Public Law 600 and the Federal Government's recognition of Puerto Rico's sovereignty as similarly irrevocable, at least in the absence of mutual consent. Congress made clear in Public Law 600 that the agreement between the Federal Government and Puerto Rico was "in the nature of a compact." 64 Stat. 319. That "solemn undertaking, based upon mutual consent, . . . of such profound character between the Federal Government and a community of U. S. citizens," has struck many as "incompatible with the concept of unilateral revocation." *E.g.*, Report of the United States-Puerto Rico Commission on the Status of Puerto Rico 12–13 (1966); see also A. Leibowitz, Defining Status: A Comprehensive Analysis of United States Territorial Relations 172–173 (1989) (describing how "many in the Congress" understood Public Law 600 to constitute "an irrevocable grant of authority in local affairs with an understanding of mutual consent being required before Congress would resolve the ultimate status

question or change the status of the Commonwealth"). In-
deed, shortly after Congress approved the Puerto Rico Con-
stitution, federal officials expressly represented to the
United Nations that the compact was of a "bilateral na-
ture," such that its "terms [could] be changed only by com-
mon consent." F. Bolton, U. S. Rep. to the Gen. Assembly,
Statement to U. N. Committee IV (Trusteeship) (Nov. 3,
1953), reprinted in 29 Dept. State Bull. 802, 804 (1953); see
also Press Release No. 1741, U. S. Mission to the United
Nations, Statement by M. Sears, U. S. Rep. in the Comm.
on Information From Non-Self Governing Territories 2
(Aug. 28, 1953) ("[A] compact . . . is far stronger than a
treaty" because it "cannot be denounced by either party un-
less it has the permission of the other").[3]

   All of this presses up against broader questions about
Congress' power under the Territories Clause of Article IV,

———————

   [3] In opting to proceed with Puerto Rico's Commonwealth endeavor by
way of compact, Public Law 600 was not entirely without precedent.
When Congress enacted the Northwest Ordinance prior to Ratification
to govern the newly acquired Northwest Territory, it provided for a cat-
alog of fundamental rights, styled as "articles of compact between the
original States and the people and States in the said territory" that
would "forever remain unalterable, unless by common consent." Act of
Aug. 7, 1789, 1 Stat. 52, n. (*a*) (reproducing the Northwest Ordinance of
1787). That understanding of a compact between the Federal Govern-
ment and the Territories was the only extant precedent for the compact
language in Public Law 600, and proponents of Public Law 600 were vo-
cal in their reliance on the Northwest Ordinance as a model. See Lawson
& Sloane, The Constitutionality of Decolonization by Associated State-
hood: Puerto Rico's Legal Status Reconsidered, 50 Boston College L. Rev.
1123, 1149, n. 142 (2009) (prior to Public Law 600, "[t]he term 'compact'
. . . had seldom appeared in U. S. law," with the exception of the North-
west Ordinance and subsequent organic statutes modeled after the
Northwest Ordinance); J. Trías Monge, Puerto Rico: The Trials of the
Oldest Colony in the World 111 (1997) (discussing debate among the
drafters of Public Law 600 about whether to adopt the precise compact
language in the Northwest Ordinance).

U. S. Const., Art. IV, §3, cl. 2, the purported source of legislative authority for enacting PROMESA, see §101(b)(2), 130 Stat. 553; *ante*, at 5.  May Congress ever simply cede its power under that Clause to legislate for the Territories, and did it do so nearly 60 years ago with respect to Puerto Rico? If so, is PROMESA itself invalid, at least insofar as it holds itself out as an exercise of Territories Clause authority? This Court has never squarely addressed such questions, except perhaps to acknowledge that Congress' authority under the Territories Clause may "continu[e] until granted away." *National Bank* v. *County of Yankton*, 101 U. S. 129, 133 (1880); cf. *Cincinnati Soap Co.* v. *United States*, 301 U. S. 308, 319 (1937) (recognizing that a statute preparing the Philippine Islands for independence from the United States "brought about a profound change in the status of the islands and in their relations to the United States," such that "the power of the United States has been modified," even while "it has not been abolished").

After all, the Territories Clause provides Congress not only the power to "make all needful Rules and Regulations respecting the Territor[ies]," but also the power to "dispose of" them, which necessarily encompasses the power to relinquish authority to legislate for them.  U. S. Const., Art. IV, §3, cl. 2.  And some have insisted that the power to cede authority exists no less in the absence of full "dispos[al]" through independence or Statehood.  See Aleinikoff, Semblances of Sovereignty, at 77 ("It has been strongly argued that" with "the establishment of commonwealth status," "Congress lost general power to regulate the internal affairs of Puerto Rico").

Still, the parties here do not dispute Congress' ability to enact PROMESA under the Territories Clause in the first place; nor does it seem strictly necessary to call that matter into question to resolve the Appointments Clause concern presented here.  Despite the "full measure of self-government" the island supposedly enjoys, U. N. Charter, Art. 73; see

also *supra*, at 4–5, 9–12, Puerto Rico can well remain a
"Territory" subject to some measure of Congress' Territories
Clause authority. But even assuming that the Territories
Clause thus enables Congress to enact federal laws "re-
specting" Puerto Rico, U. S. Const., Art. IV, §3, cl. 2, still
some things the Clause does not necessarily do: It does not
necessarily allow Congress to repeal by mere implication its
prior grant of authority to the people of Puerto Rico to
choose their own governmental officers. It does not neces-
sarily give Congress license to revoke unilaterally an in-
strument that may be altered only with mutual consent.
And it does not necessarily permit Congress to declare by
fiat that the law must treat its exercise of authority under
the Territories Clause as territorial rather than federal, ir-
respective of the compact it entered with the people of
Puerto Rico leaving complete territorial authority to them.
Cf. Hernández Colón, The Evolution of Democratic Govern-
ance Under the Territorial Clause of the U. S. Constitution,
50 Suffolk U. L. Rev. 587, 605 (2017) (after 1952, "Congress
partially relinquished its territorial powers over Puerto
Rico's *internal* affairs, as recognized in *Sanchez Valle*," even
while "Congress continues to retain territorial powers in
*federal* affairs" (emphasis added)).

## III

Nor is it significant that Congress has historically pro-
vided for the appointment of officers who perform duties re-
lated to the Territories through methods other than those
prescribed by the Appointments Clause. Those methods
may be permissible up to a point in a Territory's develop-
ment. But that historical practice does not, in my view, re-
solve the far more complex question whether Congress can
continue to act in that manner indefinitely or long after
granting Territories complete self-government.

Essentially none (if any) of the allegedly nonconforming

appointments referenced by the parties occurred in circumstances where, as in the case of Puerto Rico, Congress previously granted the Territories complete home rule. See *infra*, at 19–21, and nn. 4–5. Instead, they largely occurred during the initial or transitional stages of a Territory's existence, when often the terms of the organic statute establishing the Territory expressly provided for the Federal Government to act on behalf of the Territory. (After all, in newly established Territories, no recognized territorial government existed until the organic statute established one.) Because in that state of affairs, an organic statute plainly contemplated that *Congress* had authority to establish offices for the Territory, such congressionally established offices could fairly—indeed, necessarily—be treated as "territorial" to the extent they were tasked with territorial duties.

Does that necessarily remain the case if Congress later grants or establishes complete territorial self-government? As Puerto Rico's history may demonstrate, it is seemingly at that point that Congress purports to recognize that the Territory itself (not the Federal Government) wields authority over matters of the Territory, including the ability to select its own territorial officers. Perhaps it is also at that point that a distinction between territorial officers and federal officers crystallizes: Territorial officers are those who derive their authority from the people of the Territory; federal officers are those who derive their authority from the Federal Government. And here, the Board members indisputably are selected by the Federal Government, under a statute passed by Congress that specifies not just their governance responsibilities but also the priorities of their decisionmaking. See *ante*, at 3–4.

The scores of historical vignettes highlighted by petitioners, see, *e.g.*, Brief for Petitioner Financial Oversight and Management Board for Puerto Rico 28–33; Brief for Peti-

tioner Official Committee of Retired Employees of the Commonwealth of Puerto Rico 10–17, do not appear to foreclose this possibility or even address the question. Rather, they seem consistent with a broader historical narrative about early territorial development: that Congress has traditionally exercised its power under the Territories Clause with the aim of promptly preparing newly established Territories to transition gradually to territorial self-government. To the extent Congress deviated from the requirements of the Appointments Clause in establishing territorial governments, it generally did so either to facilitate temporary governments in the Territories before self-government was practically possible or to begin transferring appointment authority directly into the hands of the territorial population.

For example, Congress has often provided for territorial officials to be appointed by a (Presidentially nominated and Senate confirmed) territorial Governor, a method that the Appointments Clause does not appear to contemplate. See, *e.g.*, Brief for Petitioner Financial Oversight and Management Board for Puerto Rico 31, and n. 13. But those arrangements arose from the organic statutes establishing the Territories (and thus their initial territorial governments) in the first place.[4] The same is generally true of instances where Congress provided for Presidential appointment (without Senate confirmation) of territorial officials whose duties might otherwise make them principal officers under the Appointments Clause (requiring Senate confirmation). See, *e.g.*, Brief for Petitioner Official Committee of Retired Employees of the Commonwealth of Puerto Rico

---

[4] See, *e.g.*, 1 Stat. 51–52, and n. (*a*) (1789) (Northwest Territory); Act of Feb. 3, 1809, ch. 13, §§1, 2, 2 Stat. 514–515 (Illinois); Act of June 4, 1812, §2, 2 Stat. 744 (Missouri); Act of Feb. 8, 1861, ch. 59, §§1, 7, 12 Stat. 172, 174 (Colorado); Act of May 26, 1864, ch. 95, §§1, 7, 13 Stat. 85, 88 (Montana); Act of July 25, 1868, ch. 235, §§1, 7, 15 Stat. 178, 180 (Wyoming); Act of May 2, 1890, ch. 182, §§1, 7, 26 Stat. 81, 85 (Oklahoma).

11. Those scenarios broadly conformed with the template of the organic statute establishing the Louisiana Territory, 2 Stat. 245, which Congress passed as an "emergency provisio[n]" shortly after territorial acquisition in order "to preserve order until a proper government could be put in place," D. Currie, The Constitution in Congress, The Jeffersonians: 1801–1829, p. 112 (2001).[5]

As for the numerous instances where officers with territorial responsibilities were popularly elected or appointed by territorial officials, see *ante*, at 11, Congress typically transitioned to these arrangements after establishing an initial territorial government. The Northwest Ordinance, for example, allowed the Governor to appoint "magistrates and other civil officers" "during the continuance of [a] temporary government" established at the outset of the Northwest Territory's existence, as "necessary for the preservation of the peace and good order." Act of Aug. 7, 1789, ch. 8, 1 Stat. 51, n. (*a*). As soon as the Territory met a certain population threshold, however, the territorial population was to directly elect members of the lower house of the territorial legislature, which would in turn play a role in selecting the civil officers of the territorial government. *Ibid.* Following the Northwest Ordinance's lead, the organic statutes for many subsequent territories contemplated similar

—————————

[5] See 2 Stat. 245 (1803) (Louisiana) (authorizing the President to "take possession of, and occupy the territory," to "employ any part of the army and navy of the United States" in doing so, and to establish a "temporary government" "until . . . provision for the temporary government . . . be sooner made by Congress"); cf. 3 Stat. 524 (1819) (Florida) (similar); 31 Stat. 910 (1901) (Philippines) (authorizing the establishment of a "temporary government" pending "the establishment of a permanent civil government"); 33 Stat. 429 (1904) (Panama Canal Zone) (authorizing the President "[t]o provide for the temporary government" of the Territory "until . . . provision for the temporary government . . . be sooner made by Congress").

arrangements for "transition[ing]" quickly to forms of "representative government." J. Eblen, The First and Second United States Empires: Governors and Territorial Government 1784–1912, pp. 54, 59 (1968); see also Leibowitz, Defining Status, at 6–7.

Congress' provision of limited or incremental home-rule measures, moreover, seems to reveal little about the restrictions the Appointments Clause imposes on officers selected by the Federal Government. By definition, selection by home rule does not track the methods outlined in the Appointments Clause. But perhaps that is because home-rule measures give to the Territory the ability to select its own governing officers, which by necessity are territorial rather than federal. That the Territory selects its own governing officers, and that these officers are necessarily territorial, does not obviously imply that Congress may disregard the Appointments Clause when it later provides for the Federal Government to select officers carrying out territorial responsibilities.[6]

In all, then, it is not particularly surprising that many officers who acted for the Territories historically were appointed in a manner other than that set out in the Appointments Clause. Viewed in proper historical context, those officers' appointments may reflect nothing more than the necessary incidents of the transition to and establishment of full territorial self-government. For the overwhelming majority of Territories in this Nation's history, of course, that turning point coincided with Statehood. See Leibowitz, Defining Status, at 6–8 (describing the "transitory nature" of the early Territories' "evolutionary process culminat[ing]

––––––––––
[6] For that reason, no unavoidable tension seems to exist between requiring compliance with the Appointments Clause for the Board members and preserving complete home rule in Puerto Rico (or, for that matter, any of the other Territories).

in Statehood" and "the establishment of popular self-government"); *District of Columbia* v. *Carter*, 409 U. S. 418, 431–432 (1973) ("From the moment of their creation, the Territories were destined for admission as States into the Union, and 'as a preliminary step toward that foreordained end—to tide over the period of ineligibility—Congress, from time to time, created territorial governments, the existence of which was necessarily limited'" (quoting *O'Donoghue* v. *United States*, 289 U. S. 516, 537 (1933))). But critically, the transitional phase was never intended to last indefinitely. See Amar, America's Constitution, at 273 (describing the Founders' understanding that "[t]he older states would help their younger siblings grow up and would thereafter regard them as equals, rather than as permanent adolescents—the status to which Mother England had wrongly relegated her own New World wards"). The historical examples thus reveal little, if anything, about Congress' ability to establish territorial officers in Territories that (much like Puerto Rico) have long operated under the full measure of self-government.

This Court's precedents do not speak to that circumstance either. No doubt the Court has said that the Territories Clause gives Congress "full and complete legislative authority over the people of the Territories and all the departments of the territorial governments." *County of Yankton*, 101 U. S., at 132–133; see also *id.*, at 133 ("Congress may not only abrogate laws of the territorial legislatures, but it may itself legislate directly for the local government"); *Sere* v. *Pitot*, 6 Cranch 332, 337 (1810); *ante*, at 3–4 (THOMAS, J., concurring in judgment). But none of those cases had to do with the Appointments Clause. More important, none of them addressed the scope of Congress' authority with respect to a fully self-governing Territory. See Leibowitz, Defining Status, at 15 (observing that "the broad statements of Congressional power" in those cases "were

made in the context of a territory's evolution toward state-hood," and that "[t]his context was the 'restriction . . . necessarily implied in its terms'"). Much less do those cases inform whether and how Congress may validly act on behalf of a Territory like Puerto Rico, as to which Congress has expressly (and perhaps irrevocably in the absence of common consent) "relinquished . . . control over . . . [territorial] affairs." *Flores de Otero*, 426 U. S., at 597; see also *Rodriguez*, 457 U. S., at 8 (describing Puerto Rico as "an autonomous political entity, 'sovereign over matters not ruled by the [Federal] Constitution'" (quoting *Calero-Toledo*, 416 U. S., at 673)). Indeed, as the same cases expressly acknowledged, Congress' authority under the Territories Clause may "continu[e]" only "until granted away." *County of Yankton*, 101 U. S., at 133; see also *supra*, at 15–16.

\*    \*    \*

These cases raise serious questions about when, if ever, the Federal Government may constitutionally exercise authority to establish territorial officers in a Territory like Puerto Rico, where Congress seemingly ceded that authority long ago to Puerto Rico itself. The 1950s compact between the Federal Government and Puerto Rico undoubtedly carried ramifications for Puerto Rico's status under federal and international law; the same may be true of the Appointments Clause analysis here. After all, the long-awaited promise of Public Law 600's compact between Puerto Rico and the Federal Government seemed to be that the people of Puerto Rico may choose their own territorial officers, rather than have such officers foisted on the Territory by the Federal Government.

Viewed against that backdrop, the result of these cases seems anomalous. The Board members, tasked with determining the financial fate of a self-governing Territory, exist in a twilight zone of accountability, neither selected by

Puerto Rico itself nor subject to the strictures of the Appointments Clause. I am skeptical that the Constitution countenances this freewheeling exercise of control over a population that the Federal Government has explicitly agreed to recognize as operating under a government of their own choosing, pursuant to a constitution of their own choosing. Surely our Founders, having labored to attain such recognition of self-determination, would not view that same recognition with respect to Puerto Rico as a mere act of grace. Nevertheless, because these issues are not properly presented in these cases, I reluctantly concur in the judgment.